HUNTER, JR., Robert N., Judge.
*275 Brandon Malone ("Defendant") appeals following a jury verdict convicting him of first-degree murder and assault with a deadly weapon with intent to kill inflicting serious injury. Following the verdicts, the trial court imposed concurrent sentences of life imprisonment without parole for murder and 83 to 112 months imprisonment for assault. On appeal, Defendant contends the trial court erred in allowing eyewitness testimony in violation of the North Carolina Eyewitness Identification Reform Act of 2007 ("EIRA") and due process of law. After review we find the court erred to the prejudice of Defendant and order a new trial.
*276 I. Factual and Procedural Background
On 5 November 2012, an Alamance County Grand Jury indicted Defendant for first-degree murder and assault with a deadly weapon with intent to kill inflicting serious injury. On 12 March 2016, Defendant filed a written motion to suppress eyewitness identification evidence. In his written motion, Defendant argued the State subjected two eyewitnesses, Claudia Lopez and Cindy Alvarez, to an impermissibly suggestive identification procedure when they were "put in a location where [Defendant] could not see [them] and asked to watch him walk from the transport vehicle to the [c]ourthouse for hearings in his case. He was handcuffed and alone, with no co-defendants or other prisoners and he was dressed in a jail jumpsuit." Defendant contends this constituted an impermissible, single-person show-up of Defendant. Therefore, Defendant argued their in-court identification of Defendant, as well as any discussion of what occurred during the show-up, should be suppressed as irreparably tainted. On 14 *642 March 2016, the Alamance County Superior Court called Defendant's case for trial and began a voir dire hearing on Defendant's pretrial motion to suppress.
In defense of the motion the State called Claudia Salas Lopez. Lopez is an eyewitness to the murder of Kevette Jones. On 23 October 2012, Lopez sat on the front porch of Jones's house, approximately ten feet away him, when he was shot. While on the stand, she recalled two men were involved in the shooting. The shooter wore a white t-shirt, had shoulder length hair, and exited the passenger side of a blue vehicle; the other man drove the vehicle, spoke to Jones, and had an eyebrow piercing.
The day after the shooting Lopez gave the following description of the two men to detectives. She stated one of the black males is tall with braids and wore a hat, and the other man is shorter, but she could not then remember any of his distinguishing features. She told the detectives one of the men had his hand in his pocket, but she could not remember which one. She testified when she first spoke to the detectives she was in a state of shock from having witnessed her good friend get shot.
During a second interview on 25 October, Lopez stated one of the men wore dark pants, a black and white plaid shirt, and had shoulder length dreadlocks. The only description she gave of the second suspect was he had shorter hair. Lopez further testified "I never really paid much attention to [Defendant's] face because the whole time he was standing in front of us he just had his hand in his pocket."
On 25 October Detective Kevin King of the Burlington Police Department prepared a photographic lineup for Lopez. He selected *277 Defendant's photograph from the police department's database, along with seven other subjects having the same general description. The same day another officer administered the line-up to Lopez, showing her each of the eight photographs one at a time. Upon viewing Defendant's photograph, Lopez did not identify him. However, when shown the eight photographs a second time, Lopez paused on Defendant's picture for a longer period of time than the other pictures. She stated the picture looked like him, but she was not sure. Because Lopez was not confident in her identification, the administering officer did not consider her remarks to be a positive identification.
The photograph of Defendant which was used in the line-up was taken approximately a year and a half prior to the date of the offense. In the photo Defendant had a hairstyle described as plats which were pulled back; however, a more recent photograph showed Defendant's hair in "dreadlocks that come down the side."
Lopez had no further contact with anyone from the court system, including the District Attorney's office, for approximately three and a half years. Then, a few weeks before trial Iris Smith, a legal assistant with the Alamance County District Attorney's office, contacted her to arrange a meeting in order to "talk about coming in to testify." Smith told Lopez a hearing related to this case would take place on 29 February 2016. Lopez and Alvarez met Smith on that day and Smith showed them photographs of Defendant and Marquis Spence-who had already been convicted for his role in the shooting. Smith also showed them a surveillance video, taken from a security camera outside a house on the street where the incident occurred; as well as part of Defendant's recorded interview with police officers.[1] While they were watching Defendant's interview, Alvarez stood near a window and happened to see Defendant exiting a police car. Alvarez directed Lopez's attention outside, and Lopez also watched Defendant exit the police car. He was wearing an orange jumpsuit, in handcuffs, and escorted by an officer.
Lopez stated her testimony regarding Jones's shooting is based on her memory of the events of 23 October 2012, and not on the photographs Smith showed her. Lopez made an in-court identification of Defendant as the man who "shot the gun." This identification was the first time she positively identified Defendant as the shooter.
*643 *278 Next, the State called Cindy Alvarez. Alvarez testified she is also an eyewitness to the shooting. She and Lopez were on the front porch of Jones's house when two men arrived in a blue car. Alvarez recalled the men began to ask Jones questions and "one of the guys pulled out a gun and then just started shooting him." Alvarez was approximately four feet away from the shooter.
When the police arrived, Alvarez gave officers a description of the two men involved in the shooting. She stated one of the men wore a blue ball cap and the other was quiet, had dark dreadlocks to his shoulders, and had dark freckles. She did not know the heights of the men because she took off running as soon as the shooting began. However, the same day she told an officer the shooter was taller than the driver. When the Defense counsel questioned her regarding the relative heights of the two men she stated "I don't know how tall [either] of them are. I was on the top of the front porch so ... I was shaken up that day so I couldn't really tell ... who was taller." Alvarez conceded Defendant does not have dark freckles and she stated "I wasn't really paying attention like seeing if he had freckles or not. I was just ... I know it was him. I just remember I messed up on the freckles."
The day after the shooting officers showed Alvarez two different photo arrays. In the first line-up she identified Spence, not Defendant, as the shooter. She stated she was 80% sure photo number six, which was Spence, was the shooter, but she would be 100% sure if he had long dreadlocks. On cross-examination defense counsel asked Alvarez whether her identification of Spence as the shooter was "an accurate portrayal of what happened," to which Alvarez responded "I mean, yes. But at that time when I did this, ... I was shocked. ... Like, it had just happened so I couldn't really ... say which one it was because my head was just everywhere. I was just [emotional]...." For the second array, which included a photograph of Defendant, Alvarez stated number seven-which was not Defendant's photograph-looked like the suspect. She stated she was not sure, because at the time of the incident she was focused on the shooter, again implying she believed Spence to be the man who shot Jones.
The State showed Alvarez a photograph of Defendant which Alvarez testified she saw on the Internet a week or two after the shooting. She testified the picture looked more like Defendant as she recalled from the day of the shooting, than the photos used in the array, because his hair was different. She stated when she first saw the photograph on the Internet she was certain it was the man who shot Jones. Alvarez made an in-court identification of Defendant.
*279 Alvarez further confirmed Lopez's testimony regarding the 29 February meeting with Smith. Lopez had previously asked Smith to keep her "informed of what's going to be happening in the courts" so Smith told her about the hearing taking place on 29 February, and Alvarez decided to go. As soon as Smith showed Lopez and Alvarez the updated photographs of Defendant, Alvarez instantly knew it was the shooter.
Alvarez asked Smith to view the video of Defendant's interview with officers. She stated:
[W]e didn't even watch it ... five minutes because when that happened I was standing up. And I looked out the window and that's when I saw him. And then I was, like, that's him, that's the guy that shot Kevette. And then after that, I told [Smith] I was, ... leaving, and then [Claudia and I] both decided just to leave.... We didn't stay to hear, ... the court or anything.
She confirmed Lopez's testimony regarding watching Defendant exit the police car in handcuffs and a jumpsuit. Alvarez stated no one told them the hearing taking place was for the shooter, Smith did not indicate who was in the photograph, nor did she suggest the man getting out of the car was the shooter. Smith did not pose any questions regarding an identification of the man exiting the car, or the man in the photographs.
The State then called Iris Smith. Smith testified she asked Lopez and Alvarez to come to the courthouse on 29 February to give them a copy of their interviews to review for trial, and to show them updated *644 pictures of Defendant and Spence. Smith stated:
I gave [Lopez and Alvarez] copies of their interviews and told them that [the District Attorney] wanted them to review their interviews that they had given with the police. And I pulled ... some updated pictures, which the girls had already seen ... on Facebook. ...
When Smith showed Alvarez the first picture, Alvarez pointed directly to Defendant's picture and exclaimed "that's him, that's the shooter, that's the one that shot Kevette." Smith stated she only played the video of Defendant's interview with officers for approximately two or three minutes. Smith "couldn't get [the video] to work at first and then when [she] did get it to work ... he wasn't really saying anything." She confirmed both witnesses' testimony regarding seeing Defendant get out of the police car. Smith stated when Alvarez or Lopez spoke about the pictures, or viewed Defendant in person, they were not prompted *280 in anyway and Smith did not ask them questions about whether they recognized Defendant.[2]
Defendant offered no evidence and the court heard the parties on the motion to suppress. Defendant argued the District Attorney's office conducted impermissibly suggestive identification procedures which created a substantial likelihood of irreparable misidentification by showing Lopez and Alvarez Defendant's interview, photos of Defendant and Spence together after Spence had already been convicted, and Defendant in-person, exiting the police car. After hearing both parties on the motion, the trial court found the following facts.
On [23 October] 2012, Anthony Kevette Jones was shot and killed at his residence. Claudia Lopez and Cindy Alvarez were at the scene of the shooting on Mr. Jones'[s] front porch, along with Mr. Jones.
A blue car arrived at the scene. There were two black males in the car. The two males came into the area where Mr. Jones was located. The driver of the blue car spoke to Mr. Jones and essentially did most or all of the talking on behalf of the two males. The other male person, the passenger in the blue car, pulled a gun and shot Mr. Jones. That led to his death.
That Claudia Lopez was ten feet away from Mr. Jones when he was shot. That Cindy Alvarez was four feet from the shooter when Mr. Jones was shot. [Lopez] and [Alvarez] each gave some description of the two males giving some information about clothing. [Lopez] also described that the shooter had on a white T-shirt with shoulder length hair and the speaker had [a] body piercing.
On [25 October] 2012, the Burlington Police Department conducted an identification procedure with [Lopez] and with [Alvarez]. Those procedures involved photographic arrays, sometimes referred to by the officer as photo line-ups.
*281 In one array the Burlington Police Department used a photo of Marquis Spence, who's a charged co-defendant in ... connection with this matter. So [they] used a photo of Marquis Spence and seven fillers. Filler being seven folks who are not involved or have been excluded from involvement in the incident under investigation.
In the other array the Burlington Police Department used a photo of [Defendant] and seven fillers. The Burlington Police Department did not use a current photo of ... [D]efendant as reflected the current photo being introduced into evidence as State's Exhibit No. 3. In part, because the background in the photo was different from others and that there was some concern about that causing ... [D]efendant's photo to stand out in the array.
Further, Marquis Spence's current photo showed him with an eyebrow body piercing and Burlington Police Department made *645 the decision to attempt to locate a photo without such piercing being in the photo so as not to cause Marquis Spence's photo to stand out.
In ... [D]efendant's current photo he had an unusual expression on his face as interpreted by the officer that the Burlington Police Department thought might make it stand out.
The Burlington Police Department instead used an older photo of ... [D]efendant obtained from the Division of Adult Correction website. In the photo that the Burlington police used ... [D]efendant's hairstyle, which the officer characterized as being plats, was different from the hairstyle in the current photo, which the officer characterized as dreadlocks. So the older photo had plats. Current photo dreadlocks.
[Lopez] identified [number four] Marquis Spence in the array involving that co-defendant.
At [the] hearing she referred to that identified person as the male who did the talking. She reported her level of confidence on that identification as an eight on a scale of one to ten.
On the second array, [Lopez] indicated that [number six], which was ... [D]efendant, looked like him but she was *282 not sure and she initialed that she had not-did not have a positive [identification].
[Alvarez] [identified] [number six], ... which was Marquis Spence. She indicated she had an 80% level of confidence and 100% if he had long dreads, and added that ... looked like the one that shot Kevette. So she identified Marquis Spence in that connection.
[Alvarez] in the second array identified [number seven]. This is the array that in which ... [D]efendant's photo was located. [She] [i]dentified [number seven] who is an individual named Danny Lee Johnson whose photo was included as a filler. But she indicated that she was not sure. She noted she focused on the shooter because he had his hands in his pocket the whole time.
[Lopez] and [Alvarez] each saw photos of ... [D]efendant and Marquis Spence in the online newspaper. These photos were not among those that were shown to each of them by the Burlington Police Department in the arrays. No law enforcement officer showed either [Lopez] or [Alvarez] anymore photos other than the ones shown during the course of the arrays.
... [W]hen [Alvarez] saw the online newspaper photos of ... [D]efendant and Marquis Spence, she thought to herself that these photos showed how they looked on the day of the shooting.
Further, she thought that the photo of [D]efendant was of the person who shot Kevette.
[Lopez] and [Alvarez] each went several years without contact from the District Attorney's office or contacting the District Attorney's office or without any further interaction with law enforcement in connection with all these events.
Each had contact with Iris Smith, victim witness legal assistant with the Alamance County District Attorney's office in February of 2016 as trial date approached.
... [Lopez] and [Alvarez] each knew that there was going to be a hearing in this case on [29 February] 2016, at the Alamance County Historic Courthouse. Neither knew ...
*283 whether ... [D]efendant would be present at the hearing. Iris Smith arranged to meet with each on [29 February] in the furtherance of her trial preparation duties. Because Smith was at the Historic Courthouse attending to grand jury matters, she advised [Lopez] and [Alvarez] ... to meet her at the District Attorney's office in that building.
Smith gave ... [Lopez] and [Alvarez], a copy of her respective statement to officers and showed them photos she had obtained of ... [D]efendant and Marquis Spence off of the Internet.
Up to the point when Smith downloaded the Internet photos, the only photos in the [District Attorney]'s file were the ones used in the photo arrays done by the Burlington Police Department some years earlier.
The ... photos shown by Smith on [29 February] were the same photos that each *646 [Lopez] and [Alvarez] had already seen in the online newspaper some time earlier.
Smith also began showing each a video of ... [D]efendant's statement to law enforcement officers. [Lopez] was seated at the time. [Alvarez] was standing near the window of the room in which they were meeting.
[Alvarez] then stated, there he is, the one who shot Kevette. [Lopez] and Smith got up and went over to the window. At that time ... [D]efendant was exiting alone from a patrol unit parked adjacent to the Historic Courthouse, accompanied by a law enforcement officer, dressed in an orange jumpsuit and in handcuffs.
[Lopez] testified in court that she believed that [D]efendant was the person who shot Kevette and based on the events at the scene of the shooting and not the viewing of the photos at the District Attorney's office on [29 February] or the viewing of ... [D]efendant exiting the law enforcement unit on that day or the statement that [Alvarez] made about ... [D]efendant as he exited the unit.
[Alvarez] testified in court that her identification of ... [D]efendant was based on the events surrounding the shooting and not on the [29 February] 2016, events in the [District Attorney's] office.
*284 Neither [Lopez] nor [Alvarez] knew ... [D]efendant nor Marquis Spence prior to the date of the shooting. Assistant District Attorney Alex Dawson, the [prosecutor] in this case, was not present during the meeting on [29 February] 2016, at the Historic Courthouse.
Counsel are in near agreement, ... that the amount of time that [Alvarez] and [Lopez] were in a position to observe the two males and the shooting was from 75 to 90 seconds. So I took that matter as not being in dispute....
Turning to whether the witnesses' in-court identifications of Defendant were reliable and of independent origin, the trial court found the following.
One of the first factors [in determining whether an identification is of independent origin] is the opportunity to view the crime. The [c]ourt finds that the time that [Lopez] and [Alvarez] had to view the two males and the shooting was a short period of time from 75 to 90 seconds.
The [c]ourt does find that the event was a startling event, one that would claim your attention or cause you to pay no attention and flee from the situation.
That ... Lopez was within ten feet of the shooter on the porch where Mr. Jones was shot and when he was shot and ... Alvarez was four feet from Mr. Jones when he was shot. That's the opportunity to view. They were all on the porch together.
[As to] [t]he degree of attention[,] [t]he [c]ourt finds that the two indicated that they were paying attention to the two males that came up and to Mr. Jones. The event was a startling event, one that would cause the event to stand out in their minds; that they gave a general description of clothing, hair and body piercing and the car and indication of who was driving the vehicle and who was the passenger in the vehicle.
As to the accuracy of prior description ... Lopez described the shooter as having shoulder length hair. ... [D]efendant had shoulder length hair at or around the time of the shooting. At the arrays of the Burlington Police Department [Lopez] identified Marquis Spence as the main talker. ... also being the driver of the vehicle. And [she] was not *285 sure about ... [D]efendant as the shooter and did not make a positive [identification]. She did linger over ... [D]efendant's photo during the course of the array.
[Alvarez] identified Marquis Spence as the shooter and did not pick ... [D]efendant as the other person [instead] picking a completely unassociated individual.
[As to] [t]he level of certainty demonstrated at the confrontation, ... [Alvarez] and [Lopez] had seen these photos before so they were not new photos. ... Alvarez had recognized the photos as the two males as they looked at or around the time of the shooting.
... [Lopez] and [Alvarez] each recognized ... [D]efendant as he exited the law enforcement *647 unit. Both appeared confident in their identifications during that event. ...
[In regard to] [t]he length of time between [the] crime and [the] confrontation[,] [t]here [were] approximately three and a half years between the shooting and the [29 February] event. ...
The trial court considered these findings and concluded the "showing of the photos, the video, and seeing ... [D]efendant in person at the ... [c]ourthouse on [29 February 2016], was not impermissibly suggestive." The court also concluded "based on the testimony of the two witnesses ... in the courtroom, that those identifications are of independent origin."
The case then proceeded to trial and the State called Callen Burnette. Burnette testified at the time of the incident she lived in Durham with her friends Arianna McCray and Lakreisha Shoffner. She initially met Defendant and Spence approximately one month before the shooting and saw them again on three or four occasions prior to the shooting. On two occasions they ordered pizza together, played video games, and watched television. On one occasion they spent at least an hour to an hour and a half together at McCray's house. On another occasion Defendant and Spence visited McCray's house to drop off marijuana. Burnette never saw Defendant and Spence separately and stated "[e]very time I [saw] them they were together."
On the date of the incident Burnette rode with Defendant and Spence from Durham to Burlington because she had arranged a deal for Defendant and Spence to purchase marijuana from her friend Jared Alston. Spence and Defendant met Burnette and Shoffner at McCray's *286 house. Spence arrived driving a blue vehicle and Defendant was in the passenger seat. They all left in the blue car and stopped at a gas station to pick up McCray.
When McCray arrived Burnette and Shoffner got into McCray's vehicle. Spence and Defendant then followed McCray's car to Jones's house on Avon Avenue. When they arrived McCray introduced Alston to Defendant and Spence, then Alston got into McCray's car. Both vehicles left Avon Avenue and the group went to Creekside Apartments. When they arrived Alston exited McCray's car and got into Spence's car. Momentarily, he returned to McCray's car and stated he would be back in five minutes. After approximately fifteen minutes passed, Defendant looked into McCray's car and asked where Alston was. Burnette then got out of the car and walked around the apartment complex looking for Alston. After forty-five minutes to an hour passed without finding him, Defendant and Spence left stating they were going back to Raleigh to make some money.
Burnette, McCray, and Shoffner drove to Alston's house but did not find him. They then returned to Jones's house. When they arrived there were several people in the yard and on the front porch. Shoffner got out of the car and spoke with Tabias Sellers, then quickly ran back to the car and they left.
A few days later Burnette spoke with a detective and completed a photo lineup. She identified Spence as the driver with 100% confidence; however she did not identify Defendant and she stated she was not sure which man was the shooter. She described the appearance of the two men, stating Spence had dreadlocks braided back, to right under his jaw bone, and Defendant had short plats.
The State showed Burnette the photo arrays and mug shots of Defendant and Spence. Burnette recognized the mug shots from seeing them in the news. She testified the mug shot of Defendant showed his hair in plats, hanging down, as she remembered it on the day of the incident. However, Defendant's photo used in the line-up portrayed a different style-short braids which were straight back. She also stated the photo used in the line-up appeared to be an older photo of Defendant.
The State then called Lakreisha Shoffner. Shoffner confirmed Burnette's testimony concerning the occasions when they spent time with Defendant and Spence. At the time of the incident Shoffner was "get[ting] to know [Defendant] a little bit more than a friend" and was building a dating relationship with him. Shoffner also confirmed Burnette's testimony regarding the events which *648 took place on the day *287 of the shooting. When they arrived at Creekside Apartments, Shoffner watched Alston get out of McCray's vehicle and into Spence's car and "saw [Defendant] hand [Alston] money from out of the glove box." Alston then emerged from the car with the money and did not return.
Shoffner testified when they returned to Jones's house "[she] saw everyone still standing outside as if nothing ever occurred." When she got out of the car she asked where Alston was "[a]nd then [she] was informed ... to not come up to the house." She saw Jones's feet hanging out of the side of a vehicle as others were trying to transport him to the hospital. She also saw a man with blood on his shirt. She testified "[s]o then I just put two and two together, you know, to leave." A few days later officers administered a photo line-up to Shoffner. She positively identified Spence with 100% confidence and positively identified Defendant with a confidence level of 8.59 out of ten.
The State then called Arianna McCray. McCray testified she met Defendant and Spence in the summer of 2012 "[a]nd they started liking ... me and ... [Shoffner] and we had started to build a friendship. ..." She testified she thought the two men were brothers and she had never seen the two separately. She confirmed the testimony of Shoffner and Burnette concerning the events of 23 October.
Officers administered a photo line-up to McCray on 25 October 2012. She identified Spence with a confidence level of 100% and identified Defendant with confidence level of 80%. She stated she was only 80% sure because the picture of Defendant in the line-up showed him with a different hairstyle and he looked younger in the picture.
The State next called Claudia Lopez. Lopez testified on 23 October, she and Alvarez were at Jones's house, sitting on the porch when two men arrived in a blue car, blocking the driveway. The men approached the front porch and asked Jones where Alston was, claiming Alston "had [run] off with some ... money." Jones replied he did not know, "[t]he last time I saw him he left with you guys." The driver then asked for Alston's phone number, and Jones said he did not have it. The driver responded "that's your man, what do you mean you don't have his number." Then Micah White, who was also on the porch stated "we don't have his number. He's always calling from different phones." At that point the shorter of the two men said "b***s*** " and the shooting began.
While the conversation was going on Lopez noticed the shorter man was holding his right pocket as if he had a gun in it and "[i]t looked like he had his finger on the trigger." "Right after he said [b***s***], he pulled a gun out of his ... pocket and started shooting." She heard four or five shots then the men ran towards their car.
*288 From the time the men got out of their car until the time they ran back to their car after the shooting, only a minute or two had elapsed. Lopez stated one of the men was "slightly taller and the other one was just a little bit shorter wearing a white t-shirt." The taller man drove the vehicle and did the talking; he had his hair braided back and had an eyebrow piercing. The shorter man was the passenger. The shooter wore a white t-shirt and his hair "was loose with little braids ... up to his shoulders." The State showed Lopez a photograph, which Lopez identified as the shooter. She also recognized the picture of Spence, who she identified as the talker and the taller of the two men. Lopez made an in-court identification of Defendant as the shooter. Defense counsel objected to this identification, but the court overruled the objection.
The State next called Cindy Alvarez. Alvarez confirmed Lopez's testimony regarding the events on 23 October. She testified one of the men wore a white long-sleeved shirt and the other wore a blue hooded coat. She also testified the passenger kept his hands in his pocket, where she could see the tip of a gun. After noticing the gun, she told Lopez they needed to leave. Lopez asked the driver to move, to which he replied "he would move when he finished." Then "[t]he passenger ... turned around and looked at the ... driver ... the driver turned around and looked at the passenger ... and, ... nodded his head and that's when ... the passenger started *649 shooting." Alvarez identified Defendant in court as the shooter. The defense counsel objected, but the court overruled Defendant's objection.
Brad Mills, a former detective with the Burlington Police Department, also testified. Mills interviewed Alvarez following the incident, and stated she was very emotional during the interview. Alvarez told him the driver was the one who did the talking, was approximately five feet six inches tall, and wore a blue ball cap. She described the shooter as the quiet one, with dark shoulder length dreadlocks, a muscular build and slightly taller than the driver. However, during her voir dire testimony she stated she did not know the heights of the suspects because she took off running as soon as the shooting began.
The State also called Micah White. White is an eyewitness to the shooting. White stated the taller man did the talking and the shorter one had a gun in his pocket. However, Officer Megan Coggins testified she interviewed Micah White immediately after police were called to the scene of the incident and White stated the shorter black male spoke and the taller black male was the shooter. On 25 October 2012, officers administered a photo line-up to White and he did not positively identify either Defendant or Spence.
*289 The State then called Officer Steven Reed with the Burlington Police Department.[3] Officer Reed investigated the murder of Jones and interviewed Defendant as a suspect. Defendant claimed he was not in Burlington at the relevant time and he did not know where Burlington was, nor did he know Alston or Jones. Defendant was arrested at Spence's house and the blue vehicle was parked outside. Defendant claimed he had never been in that vehicle nor did he recall ever seeing it.
The State's final witness was Tabias Sellars. Sellars testified the day of the shooting he was at Jones's house and was at the front door ready to leave when he saw a blue car arrive and two men approach the house. He testified the man who spoke was the driver; he was tall, light skinned, and had dreadlocks. The driver said "[y]our boy [Alston] just beat me out of $1,200" and he asked where Alston was. Sellars described the shooter as the one who did not speak. On cross examination Defense counsel elicited testimony concerning a plea agreement Sellers offered to make in exchange for testifying in this case.[4]
At the close of all the evidence Defendant moved to dismiss the charge of assault with a deadly weapon with intent to kill inflicting serious injury and the charge of first-degree murder. The court denied both motions.
II. Standard of Review
Our review of a trial court's denial of a motion to suppress is "strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law." State v. Cooke , 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982). "The trial court's conclusions of law, ... are fully reviewable on appeal." State v. Hughes , 353 N.C. 200, 208, 539 S.E.2d 625, 631 (2000).
Although Defendant did not preserve his EIRA claim for appellate review, he requests that we review this issue for plain error. Because *290 we find error in Defendant's due process claim we need not address Defendant's EIRA argument.
III. Analysis
On appeal, Defendant argues the legal assistant's 29 February meeting with Lopez and Alvarez constituted an identification procedure *650 which violated due process of law and the EIRA. Defendant contends the trial court erred in denying his motion to suppress the eyewitness identification. Specifically, he challenges the trial court's finding that Lopez made a confident identification of Defendant on 29 February. Defendant also challenges the trial court's conclusion the identification procedures were not impermissibly suggestive, and the identifications had an independent origin. We find Defendant's argument to be persuasive.
When "lineup and confrontation procedures [are] so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification [they] violate due process and are constitutionally unacceptable." State v. Smith , 278 N.C. 476, 481, 180 S.E.2d 7, 11 (1971) (citation and quotation marks omitted). To determine whether identification procedures violate due process, North Carolina courts apply a two-part inquiry. State v. Fowler , 353 N.C. 599, 617, 548 S.E.2d 684, 698 (2001).
First we must determine whether an impermissibly suggestive procedure was used in obtaining the out-of-court identification. If this question is answered in the negative, we need proceed no further. If it is answered affirmatively, the second inquiry is whether, under all the circumstances, the suggestive procedures employed gave rise to a substantial likelihood of irreparable misidentification.
State v. Hannah , 312 N.C. 286, 290, 322 S.E.2d 148, 151 (1984) (citations omitted). "The test under the first inquiry is 'whether the totality of the circumstances reveals a pretrial procedure so unnecessarily suggestive and conducive to irreparable mistaken identity as to offend fundamental standards of decency and justice.' " Fowler , 353 N.C. at 617, 548 S.E.2d at 698 (quoting Hannah , 312 N.C. at 290, 322 S.E.2d at 151 ).
The second inquiry requires a determination of whether the identification procedures created a substantial likelihood of irreparable misidentification. "Whether there is a substantial likelihood of misidentification depends upon the totality of the circumstances." State v. Pigott , 320 N.C. 96, 99, 357 S.E.2d 631, 633 (1987). "Even when a pre-trial procedure is found to be unreliable, in-court identification of *291 independent origin is admissible." State v. Garner , 136 N.C. App. 1, 11-12, 523 S.E.2d 689, 697 (1999). Our courts consider the following factors when determining whether an identification is of independent origin and sufficiently reliable:
1) [t]he opportunity of the witness to view the criminal at the time of the crime;
2) the witness' degree of attention;
3) the accuracy of the witness' prior description;
4) the level of certainty demonstrated at the confrontation; and
5) the time between the crime and the confrontation.
Pigott , 320 N.C. at 99-100, 357 S.E.2d at 634. These factors must then be weighed against "the corrupting effect of the suggestive procedure itself." Id. at 100, 357 S.E.2d at 634.
Defendant first contends the trial court erred in concluding the pretrial identification procedures were not impermissibly suggestive. Defendant argues:
Sandwiching a viewing of the perpetrators committing the homicide in between viewings of [Defendant's] photograph and his police interrogation was extremely suggestive and improper, affecting not only their identification of [Defendant], but their memories of the style and color of clothing worn by the perpetrators, and any other details visible in the video.
After careful de novo review of the trial court's conclusion of law, we agree.
The evidence admitted at trial demonstrates after the shooting neither Lopez nor Alvarez were able to give detailed descriptions of Defendant or positively identify Defendant. Then, nearly three and a half years later and approximately two weeks prior to trial, the witnesses met with Smith, viewed a video of Defendant's interview, surveillance footage of the incident, and more recent photographs of Defendant. It is likely the witnesses would assume Smith showed them the photographs and videos because the individuals portrayed therein were suspected of being guilty.
*651 Although neither the video interview nor the surveillance footage were admitted during the suppression hearing, we reviewed this evidence in order to determine the suggestive nature of the identification *292 procedures. The surveillance video does not present a view of Jones's front porch, therefore there is no footage of the actual murder. However, Jones's driveway is clearly visible, and two men can be seen fleeing the yard and entering a dark vehicle. One of the men is wearing a noticeably white shirt. Defendant's interview with officers clearly shows him wearing a white shirt and ball cap. Even watching only a minute of the footage would allow the witnesses ample opportunity to view Defendant's features, searing his image into their memory before trial.
We must also consider whether the pretrial identification procedure "was so suggestive that there is a substantial likelihood of irreparable misidentification" or whether the in-court identification was of independent origin. Pigott , 320 N.C. at 99, 357 S.E.2d at 633 ; Garner , 136 N.C. App. at 11-12, 523 S.E.2d at 697. In reviewing the trial court's factual findings regarding this issue, we determine several of those findings were not supported by competent evidence.
First, the trial court found both witnesses paid attention to Defendant at the scene; this finding is not supported by the evidence. Although the trial court correctly found the witnesses had 75 to 90 seconds to view the suspects, it was a startling event which may have caused them to pay close attention, and the witnesses were in close proximity to the shooter, the trial court ignored the witnesses' own testimony indicating they in fact had not paid attention to Defendant. Lopez testified "I never really paid much attention to [Defendant's] face because the whole time he was standing in front of us he just had his hand in his pocket." And although Alvarez testified she "pa[id] attention to [Defendant] the minute he got out of the car[,]" the day after the incident she identified Spence as the shooter and was unable to identify Defendant in the line-up. We find the evidence clearly shows a lack of attention to Defendant.
The trial court also considered the accuracy of the witnesses' description at the time of the incident. Here, neither witness gave a detailed description of Defendant. When Lopez spoke with detectives the night of the shooting she described Defendant as shorter than the other man, wearing a white t-shirt, and the passenger of the vehicle. She stated she could not remember any of his features, admitting she did not pay attention to Defendant's face. Alvarez initially described Defendant as quiet, and having dark dreadlocks to his shoulders and dark freckles. Yet, she admitted at trial Defendant does not have dark freckles. Furthermore, neither eyewitness positively identified Defendant in a photo line-up administered only two days after the shooting.
The trial court found both Lopez and Alvarez recognized Defendant on 29 February when he exited the police car. However, the State *293 concedes this finding is inaccurate as only Alvarez identified Defendant at that time. There is no evidence in the record to demonstrate Lopez made any such identification of Defendant during the meeting on 29 February. In fact, Lopez testified during the voir dire hearing her in-court identification was the first clear identification she had made of Defendant.
Finally, the trial court considered the length of time between the crime and the confrontation and noted nearly three and a half years passed between the date of the incident and the identification procedures of 29 February.
Considering these facts we determine they do not support the trial court's conclusion the witnesses' in-court identifications of Defendant were of independent origin. The short amount of time the witnesses had to view Defendant, their inability to positively identify Defendant two days after the incident, and their inconsistent descriptions demonstrate it is improbable that three and a half years later they could positively identify Defendant with accuracy absent the intervention by the District Attorney's office. Thus, we conclude the identification procedures of 29 February were impermissibly suggestive and were not of independent origin. Therefore, they violated Defendant's due process rights.
*652 We do not find evidence in the record which supports Defendant's argument Smith subjected Lopez and Alvarez to an impermissible show-up procedure. A "show-up" is a procedure "whereby a suspect is shown singularly to a witness ... for the purposes of identification." State v. Harrison , 169 N.C. App. 257, 262, 610 S.E.2d 407, 412 (2005). Both the United States Supreme Court and the North Carolina Supreme Court "have criticized the 'practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup.' " State v. Oliver , 302 N.C. 28, 44-45, 274 S.E.2d 183, 194 (1981) (quoting Stovall v. Denno , 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199, 1206 (1967) ). Show-ups "may be inherently suggestive because the witness would likely assume that the police had brought [him] to view persons whom they suspected might be the guilty parties." State v. Oliver , 302 N.C. at 45, 274 S.E.2d at 194 (internal citations omitted) (alterations in original). Nevertheless, "pretrial show-up identifications are not per se violative of a defendant's due process rights." State v. Watkins , 218 N.C. App. 94, 105, 720 S.E.2d 844, 851 (2012) (internal citations omitted). The EIRA restricts the manner in which state, county and local law enforcement officers may conduct show-ups. N.C. Gen. Stat. § 15A-284.52(c1) (2015). The statute provides:
(1) A show-up may only be conducted when a suspect matching the description of the perpetrator is located in *294 close proximity in time and place to the crime, or there is reasonable belief that the perpetrator has changed his or her appearance in close time to the crime, and only if there are circumstances that require the immediate display of a suspect to an eyewitness.
(2) A show-up shall only be performed using a live suspect and shall not be conducted with a photograph.
(3) Investigators shall photograph a suspect at the time and place of the show-up to preserve a record of the appearance of the suspect at the time of the show-up procedure.
There is no evidence in the record to support Defendant's argument the witnesses looking outside the courthouse window at the exact moment Defendant exited a police car was a coordinated act by the District Attorney's office to have the witnesses view Defendant in-person. Although the circumstances seem suspicious, we cannot determine the District Attorney's office conducted an impermissible show-up. Nonetheless, the witnesses viewing the photographs, surveillance footage, and Defendant's interview did constitute impermissible identification procedures.
Defendant also contends the identification procedures violated several requirements of the EIRA. The State alleges the EIRA is inapplicable in this case as the identification procedures were conducted by a legal assistant, not a law enforcement officer, and the plain language of the EIRA applies only to law enforcement officers. We find the State's argument is without merit. We address this argument only to state the EIRA was enacted "to protect [d]ue [p]rocess rights during identification procedures." State v. Gamble , 243 N.C. App. 414, 420, 777 S.E.2d 158, 163 (2015). Therefore, as a general matter, to protect the due process rights of defendants, all eyewitness identification procedures should comply with the requirements of the EIRA.
Because we find the procedures violated the due process rights of Defendant, we must next decide whether the error was prejudicial.
(a) A defendant is prejudiced by errors relating to rights arising other than under the Constitution of the United States when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises. ...
*295 (b) A violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. ...
N.C. Gen. Stat. § 15A-1443. A constitutional right is involved, thus, Defendant is prejudiced unless admission of the testimony was harmless beyond a reasonable doubt.
*653 We cannot determine the admission of the identification testimony was harmless beyond a reasonable doubt. The only eyewitnesses to the murder who testified at trial were Lopez, Alvarez, Sellars, and White. None of these eyewitnesses positively identified Defendant as the shooter immediately after the incident. White never made a positive identification. Sellars identified Defendant's mug-shot, but did not make an in-court identification and Defendant contends Sellars' testimony was not credible. Lopez and Alvarez made in-court identifications of Defendant only after they were subject to the pretrial identification procedures conducted by the District Attorney's office. The only witnesses who positively identified Defendant in a photo line-up-Shoffner and McCray-were not present at the scene at the time Jones was murdered. Much of the remaining testimony as to who the shooter was is contradictory. Thus, we cannot say the court's error was harmless beyond a reasonable doubt.
The dissenting opinion asserts any error committed by the trial court was harmless. However, as noted above, because Defendant's due process rights are implicated, any error is deemed prejudicial unless the Court finds such error was harmless beyond a reasonable doubt. The dissenting opinion may be correct under the ordinary prejudicial error standard. However, under the heightened standard, which we must apply, we cannot say the error was harmless beyond a reasonable doubt.
IV. Conclusion
In sum, after careful review we hold the error is prejudicial and award Defendant a new trial.
PREJUDICIAL ERROR AND NEW TRIAL.
Judge ARROWOOD concurs.
Judge DILLON dissents in a separate opinion.

During voir dire, none of the witnesses testified as to the contents of the surveillance video.

The State also called Jerry Garner, a private investigator who served a subpoena on Alvarez on 9 March. Upon serving the subpoena he learned someone had shown Alvarez several other photographs, in addition to the photo arrays. Alvarez also told him the District Attorney had requested she and Lopez attend the 29 February meeting at the courthouse to confirm her identification of Defendant. Additionally, Alvarez told him "she went to the door of the courtroom and looked through the glass and looked into the courtroom while [Defendant] was inside the courtroom."

The State called Dana Quirindongo as an expert in firearms identification, including the identification and examination of bullets, firearms and casings. Quirindongo works in the North Carolina State Crime Laboratory in the firearms unit. She testified in her opinion State's Exhibits 34, 35, and 36 were all bullets shot from a caliber between .38 or .357 and in her opinion all three of the projectiles were fired from the same firearm.

The State recalled Detective King who testified the Durham police department executed a search warrant of Spence's house. A blue Hyundai elantra was located outside the home and the officers found a container of six .38 caliber unfired bullets.