IN THE SUPREME COURT OF NORTH CAROLINA

No. 379A17

Filed 1 November 2019

STATE OF NORTH CAROLINA

v.

BRANDON MALONE

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 256 N.C. App. 275, 807 S.E.2d 639 (2017), finding prejudicial error upon appeal from judgments entered on 7 April 2016 by Judge James K. Roberson in Superior Court, Alamance County. On 1 March 2018, the Supreme Court allowed the State's petition for discretionary review as to additional issues. Heard in the Supreme Court on 9 April 2019.

*Joshua H. Stein, Attorney General, by Jess D. Mekeel, Special Deputy Attorney General, for the State-appellant.*

*Glenn Gerding, Appellate Defender, by James R. Grant, Assistant Appellate Defender, for defendant-appellee.*

EARLS, Justice.

At approximately 6 p.m. on 23 October 2012, twenty-two year old Anthony Kevette Jones was shot and killed on the front porch of his mother's home in Burlington in a confrontation with two men. One of those men was identified soon after the shooting as Marquis Spence. The identity of the other man, who carried the gun and pulled the trigger, was the central issue in the trial of defendant Brandon

Malone. Following a two-week trial, Mr. Malone was convicted of first-degree murder and assault with a deadly weapon with intent to kill inflicting serious injury. On appeal, he argued that the trial court erred in denying his motions to suppress the testimony of two eyewitnesses, Claudia Lopez and Cindy Alvarez, including their in-court identifications of defendant as the perpetrator of the crimes. In a divided opinion, the Court of Appeals majority agreed, concluding that the eyewitness testimony at issue was the result of identification procedures that were impermissibly suggestive in violation of defendant's due process rights and that the testimony was prejudicial to defendant, requiring a new trial. *State v. Malone*, 256 N.C. App. 275, 291–95, 807 S.E.2d 639, 651–53 (2017). We affirm in part and reverse in part. The Court of Appeals was correct in holding that the identification procedures at issue here were impermissibly suggestive, but we conclude that they ultimately did not violate defendant's statutory or due process rights because Cindy Alvarez's identification of defendant was of independent origin, based on what she saw at the time of the shooting.

Background

The sun was still shining on the early fall evening in Burlington when a neighbor's security camera recorded two men pulling up to the house across the street in a blue car and exiting. Less than two minutes later, the same two men are seen in the video running back to the car, getting in and driving off in haste. Although there were several people on the porch at the time Mr. Jones was fatally shot, no eyewitness

to the shooting was able to identify defendant Malone within the first few days of the murder. Witnesses agreed that during the confrontation, one of the two men who had arrived in the blue car drew a handgun and fired multiple shots, killing Mr. Jones and wounding another man, Micah White. In the hours following the shooting, police focused their investigation on Marquis Spence, who was identified by eyewitnesses immediately afterwards, and defendant, who witnesses said was with Mr. Spence within two hours before the shooting.

Upon being arrested two days after the murder, defendant submitted to a three- to four-hour police interview without counsel in which he maintained that he was not in Burlington on October 23rd. The only direct evidence that defendant was the man who shot Jones and White was the courtroom testimony of two women who did not know him but who were on the porch of the house at the time of the shooting, Claudia Lopez and her friend Cindy Alvarez. Other circumstantial evidence was submitted by the State, including the testimony of witnesses who placed defendant in the blue car with Mr. Spence earlier that day. They also testified that he was part of the drug transaction alleged to have led to the shooting.

The State's theory of the case, based on various witness' testimony, is that Spence and Malone, who lived on the same street in Durham, were virtually inseparable drug dealers. On the afternoon in question, they arranged to purchase "a pound of weed" for $1,200 from Mr. Jones and another man, Jared "Skip" Alston. Mr. Malone gave Skip the money, expecting him to return in five minutes with the

drugs. However, true to his name, Skip disappeared. Three women from Durham testified to being present during some or all of these events, Calen Burnette, Arianna McCray, and Lakreisha Shoffner. After efforts to locate Skip were unsuccessful, the three women drove separately to Skip's house while Spence and Malone told the women not to worry, and that they were "going back to Raleigh to make some money."

When the blue car driven by Mr. Spence pulled up outside Mr. Jones's house in Burlington just before 6 p.m. that evening, Mr. Jones was sitting on the steps. Claudia Lopez was sitting on the arm of a chair approximately ten feet from Jones, and Cindy Alvarez was sitting in a chair approximately five to six feet from the shooter. Also on the porch were Skip's brother Jordan, and the other victim, Micah White. Tabias Sellars, Marcus Clayton and Gavin Jackson had just gone inside the house. Two men exited the car and approached the steps. A short conversation ensued between the driver and Jones concerning Skip's location. When Mr. Jones said that he did not have a phone number for Skip, four to six shots were fired, and the two men ran back to the blue car and fled the scene.

**Eyewitness Identifications in 2012**

Police arriving at the home shortly after the shooting spoke with witnesses. Micah White initially said he did not know which man had the gun, the driver or the passenger. Claudia Lopez told police at the scene that "she saw one of the guys' hand in his pocket, could not remember which one, but could see a silver part of a gun." She also said, referring to the shorter man, that she "did not remember . . . any

-4-

features of him." Cindy Alvarez told the officer on the scene that the shooter had dark freckles.

Two days after the shooting, Burlington Police prepared and administered two photo lineups to witnesses, one including a picture of Marquis Spence and one with a picture of Brandon Malone. Of the eyewitnesses to the shooting, Claudia Lopez identified Mr. Spence as the man who spoke with Mr. Jones with confidence of 8 out of 10. She did not identify Mr. Malone. Upon viewing the lineup a second time, Ms. Lopez "paused" at Mr. Malone's photo and said "That looks like him, but I'm not sure." The record of the photo lineup indicates no positive identification made by the witness. Cindy Alvarez identified Mr. Spence as "the one who shot Kevette" with confidence of 8 out of 10. She did not recognize Mr. Malone's photo at all and identified an entirely different photo as someone who "looks like" the man who accompanied the shooter, but she stated she was not sure because she "focused on [the] shooter because he had his hand in his pocket the whole time." Approximately a week or two after the shooting, Cindy Alvarez saw a photo of defendant on Facebook and was immediately certain "that that was the guy that shot Kevette." Ms. Lopez saw the same photo, but did not recognize defendant. Micah White, who was shot in the ankle, was unable to make a positive identification of either Mr. Spence or Mr. Malone when shown a photo lineup.

**Subsequent Proceedings**

On 5 November 2012, defendant was indicted for first-degree murder and assault with a deadly weapon with intent to kill inflicting serious injury.[1] For three and a half years, the eyewitnesses had no contact with law enforcement. On 29 February 2016, approximately two weeks before the trial of this case was set to begin, Iris Smith, a legal assistant at the District Attorney's office, asked Lopez and Alvarez to come to the old courthouse in Burlington where the District Attorney's office was located, to "confirm [their] identification of Malone." Alvarez testified that "They wanted to make sure that I was – I was – I mean, that I was saying who really – like, who is who. Like, if I recognized them." Smith testified that "I told them I had pictures I wanted them to look at, updated pictures of the defendants." Smith also gave both witnesses copies of their video-recorded police interviews. Smith showed them current photos of Malone and Spence, and asked Lopez and Alvarez if they recognized them. According to Ms. Alvarez's courtroom testimony, when she saw Mr. Malone's picture that day, she pointed to him and said that "he's the one that killed Kevette."

Ms. Alvarez was upset about having to go through a trial and asked Iris Smith what Mr. Malone was saying about the incident. Ms. Smith mentioned Mr. Malone's police interview and Ms. Alvarez asked to see it. They moved to another room in the

---

[1] Defendant was subsequently indicted for discharging a weapon into occupied property. That charge was dismissed at the close of the State's evidence.

courthouse, and Ms. Lopez sat down because she was having health issues. Ms. Alvarez was standing near a window as the women waited for the video interview to load. Ms. Smith showed Lopez and Alvarez somewhere between two to five minutes of the video of Mr. Malone's police interview. At some point Ms. Alvarez looked out the window and said "that's him, that's the guy that shot Kevette." The other two women also came to the window and watched Mr. Malone, in prison clothes and handcuffs, being escorted by a police officer from a police car and into the courthouse. Mr. Malone was in court that day for a hearing in his case. After that the witnesses left and Ms. Smith went in the court for the hearing. Ms. Alvarez told defendant's investigator that she went to the door of the courtroom, looked through the glass, and "looked into the courtroom while he [Malone] was inside the courtroom."

On 12 March 2016, defendant filed motions to suppress identification evidence from two eyewitnesses to the shooting, Claudia Lopez and Cindy Alvarez, arguing that the State subjected the witnesses to impermissibly suggestive identification procedures. On 14 March 2016, the trial court held a hearing on defendant's motions to suppress. The State called several witnesses at the hearing, including Lopez and Alvarez. In denying defendant's suppression motion, the trial court made extensive oral findings of fact, including:

> That Claudia Lopez was ten feet away from Mr. Jones when he was shot. That Cindy Alvarez was four feet from the shooter when Mr. Jones was shot. [Ms. Lopez] and [Ms. Alvarez] each gave some description of the two

males giving some information about clothing. [Ms. Lopez] also described that the shooter had on a white T-shirt with shoulder length hair and the speaker had [a] body piercing.

On [25 October] 2012, the Burlington Police Department conducted an identification procedure with [Ms. Lopez] and with [Ms. Alvarez]. Those procedures involved photographic arrays, sometimes referred to by the officer as photo line-ups.

In one array the Burlington Police Department used a photo of Marquis Spence, who's a charged co-defendant in . . . connection with this matter. So [they] used a photo of Marquis Spence and seven fillers. Filler being seven folks who are not involved or have been excluded from involvement in the incident under investigation.

In the other array the Burlington Police Department used a photo of [Defendant] and seven fillers.

The Burlington Police Department did not use a current photo of . . . [D]efendant as reflected the current photo being introduced into evidence as State's Exhibit No. 3. In part, because the background in the photo was different from others and that there was some concern about that causing . . . [D]efendant's photo to stand out in the array.

Further, Marquis Spence's current photo showed him with an eyebrow body piercing and Burlington Police Department made the decision to attempt to locate a photo without such piercing being in the photo so as not to cause Marquis Spence's photo to stand out.

In . . . [D]efendant's current photo he had an unusual expression on his face as interpreted by the officer that the Burlington Police Department thought might make it stand out.

The Burlington Police Department instead used an older photo of . . . [D]efendant obtained from the Division

of Adult Correction website. In the photo that the Burlington police used . . . [D]efendant's hairstyle, which the officer characterized as being plats, was different from the hairstyle in the current photo, which the officer characterized as dreadlocks. So the older photo had plats. Current photo dreadlocks.

[Ms. Lopez] identified [number four] Marquis Spence in the array involving that co-defendant.

At [the] hearing she referred to that identified person as the male who did the talking. She reported her level of confidence on that identification as an eight on a scale of one to ten.

On the second array, [Ms. Lopez] indicated that [number six], which was . . . [D]efendant, looked like him but she was not sure and she initialed that she had not— did not have a positive [identification].

[Ms. Alvarez identified number six], which was Marquis Spence. She indicated she had an 80% level of confidence and 100% if he had long dreads, and added that . . . looked like the one that shot Kevette. So she identified Marquis Spence in that connection.

[Ms. Alvarez] in the second array identified [number seven]. This is the array that in which . . . [D]efendant's photo was located. [She] [i]dentified [number seven] who is an individual named Danny Lee Johnson whose photo was included as a filler. But she indicated that she was not sure. She noted she focused on the shooter because he had his hands in his pocket the whole time.

[Ms. Lopez] and [Ms. Alvarez] each saw photos of . . . [D]efendant and Marquis Spence in the online newspaper. These photos were not among those that were shown to each of them by the Burlington Police Department in the arrays. No law enforcement officer showed either [Ms. Lopez] or [Ms. Alvarez] anymore photos other than the ones shown during the course of the arrays.

. . . [W]hen [Ms. Alvarez] saw the online newspaper photos of . . . [D]efendant and Marquis Spence, she thought to herself that these photos showed how they looked on the day of the shooting.

Further, she thought that the photo of [D]efendant was of the person who shot Kevette.

[Ms. Lopez] and [Ms. Alvarez] each went several years without contact from the District Attorney's office or contacting the District Attorney's office or without any further interaction with law enforcement in connection with all these events.

Each had contact with Iris Smith, victim witness legal assistant with the Alamance County District Attorney's office in February of 2016 as trial date approached.

[Ms. Lopez] and [Ms. Alvarez] each knew that there was going to be a hearing in this case on [29 February] 2016, at the Alamance County Historic Courthouse. Neither knew . . . whether . . . [D]efendant would be present at the hearing. Iris Smith arranged to meet with each on [29 February] in the furtherance of her trial preparation duties. Because [Ms.] Smith was at the Historic Courthouse attending to grand jury matters, she advised [Ms. Lopez] and [Ms. Alvarez] . . . to meet her at the District Attorney's office in that building.

Smith gave [Ms. Lopez] and [Ms. Alvarez], a copy of her respective statement to officers and showed them photos she had obtained of . . . [D]efendant and Marquis Spence off of the Internet.

Up to the point when [Ms.] Smith downloaded the Internet photos, the only photos in the [District Attorney]'s file were the ones used in the photo arrays done by the Burlington Police Department some years earlier.

The . . . photos shown by Smith on [29 February] were the same photos that each [Ms. Lopez] and [Ms. Alvarez] had already seen in the online newspaper some time earlier.

[Ms.] Smith also began showing each a video of . . . [D]efendant's statement to law enforcement officers. [Ms. Lopez] was seated at the time. [Ms. Alvarez] was standing near the window of the room in which they were meeting.

[Ms. Alvarez] then stated, there he is, the one who shot Kevette. [Ms. Lopez] and [Ms.] Smith got up and went over to the window. At that time . . . [D]efendant was exiting alone from a patrol unit parked adjacent to the Historic Courthouse, accompanied by a law enforcement officer, dressed in an orange jumpsuit and in handcuffs.

[Ms. Lopez] testified in court that she believed that [D]efendant was the person who shot Kevette and based on the events at the scene of the shooting and not the viewing of the photos at the District Attorney's office on [29 February] or the viewing of . . . [D]efendant exiting the law enforcement unit on that day or the statement that [Ms. Alvarez] made about . . . [D]efendant as he exited the unit.

[Ms. Alvarez] testified in court that her identification of . . . [D]efendant was based on the events surrounding the shooting and not on the [29 February] 2016, events in the [District Attorney's] office.

Neither [Ms. Lopez] nor [Ms. Alvarez] knew . . . [D]efendant nor Marquis Spence prior to the date of the shooting. Assistant District Attorney Alex Dawson, the [prosecutor] in this case, was not present during the meeting on [29 February] 2016, at the Historic Courthouse.

Counsel are in near agreement, . . . that the amount of time that [Ms. Alvarez] and [Ms. Lopez] were in a position to observe the two males and the shooting was from 75 to 90 seconds. So I took that matter as not being in dispute . . . .

Turning to whether the witnesses' in-court identifications of defendant were reliable and of independent origin, the trial court made additional findings:

> One of the first factors [in determining whether an identification is of independent origin] is the opportunity to view the crime. The [c]ourt finds that the time that [Ms. Lopez] and [Ms. Alvarez] had to view the two males and the shooting was a short period of time from 75 to 90 seconds.
>
> The [c]ourt does find that the event was a startling event, one that would claim your attention or cause you to pay no attention and flee from the situation.
>
> That [Ms.] Lopez was within ten feet of the shooter on the porch where Mr. Jones was shot and when he was shot and [Ms.] Alvarez was four feet from Mr. Jones when he was shot. That's the opportunity to view. They were all on the porch together.
>
> [As to] [t]he degree of attention[,] [t]he [c]ourt finds that the two indicated that they were paying attention to the two males that came up and to Mr. Jones. The event was a startling event, one that would cause the event to stand out in their minds; that they gave a general description of clothing, hair and body piercing and the car and indication of who was driving the vehicle and who was the passenger in the vehicle.
>
> As to the accuracy of prior description . . . [Ms.] Lopez described the shooter as having shoulder length hair. . . . [D]efendant had shoulder length hair at or around the time of the shooting. At the arrays of the Burlington Police Department [Ms. Lopez] identified Marquis Spence as the main talker. . . . also being the driver of the vehicle. And [she] was not sure about . . . [D]efendant as the shooter and did not make a positive [identification]. She did linger over . . . [D]efendant's photo during the course of the array.

[Ms. Alvarez] identified Marquis Spence as the shooter and did not pick . . . [D]efendant as the other person [instead] picking a completely unassociated individual.

[As to] [t]he level of certainty demonstrated at the confrontation, . . . [Ms. Alvarez] and [Ms. Lopez] had seen these photos before so they were not new photos. . . . [Ms.] Alvarez had recognized the photos as the two males as they looked at or around the time of the shooting.

. . . [Ms. Lopez] and [Ms. Alvarez] each recognized . . . [D]efendant as he exited the law enforcement unit. Both appeared confident in their identifications during that event . . . .

[In regard to] [t]he length of time between [the] crime and [the] confrontation[,] [t]here [were] approximately three and a half years between the shooting and the [29 February] event. . . .

Based on these and other findings of fact, the trial court denied defendant's motion to suppress, concluding that the events on 29 February 2016 during which Ms. Lopez and Ms. Alvarez saw photographs of Malone, viewed portions of his videotaped interview, and saw him being led into the courthouse by police were "not impermissibly suggestive." The court further concluded that "based on the testimony of the two witnesses, Claudia and Cindy, in the courtroom, that those identifications are of independent origin."

The jury found defendant guilty of assault with a deadly weapon inflicting serious injury and first degree murder on the basis of both premeditation and deliberation and the felony murder rule. The trial court imposed concurrent

sentences of life without parole for the murder and 83 to 112 months for the assault. Defendant gave notice of appeal.

At the Court of Appeals, defendant challenged the trial court's denial of his motions to suppress, arguing that the 29 February meeting constituted an impermissibly suggestive identification procedure in violation of his due process rights and the Eyewitness Identification Reform Act (EIRA). *See* N.C.G.S. §§ 15A-284.50 to -284.53 (2017). The Court of Appeals agreed, determining first that the trial court erred in concluding that the pretrial identification procedures were not impermissibly suggestive:

> The evidence admitted at trial demonstrates after the shooting neither Lopez nor Alvarez were able to give detailed descriptions of Defendant or positively identify Defendant. Then, nearly three and a half years later and approximately two weeks prior to trial, the witnesses met with Smith, viewed a video of Defendant's interview, surveillance footage of the incident, and more recent photographs of Defendant. It is likely the witnesses would assume Smith showed them the photographs and videos because the individuals portrayed therein were suspected of being guilty.

*Malone,* 256 N.C. App. at 291, 807 S.E.2d at 650. Additionally, after identifying that several of the trial court's findings of fact were not supported by competent evidence, the court determined that the trial court erred in concluding that the in-court identifications of defendant were of independent origin, stating:

> The short amount of time the witnesses had to view Defendant, their inability to positively identify Defendant two days after the incident, and their inconsistent

> descriptions demonstrate it is improbable that three and a
> half years later they could positively identify Defendant
> with accuracy absent the intervention by the District
> Attorney's office.

*Id.* at 293, 807 S.E.2d at 651. The Court of Appeals concluded that because the 29 February meeting constituted impermissibly suggestive identification procedures and because the in-court identifications were not of independent origin, the procedures violated defendant's due process rights. *Id.* at 293, 807 S.E.2d at 651. Finally, the court determined that the impermissible identification procedures were not harmless beyond a reasonable doubt and therefore were prejudicial to defendant, requiring a new trial. *Id.* at 294–95, 807 S.E.2d at 652–53.

One member of the panel dissented, opining first that there was no error in the admission of Ms. Alvarez's in-court identification because it had an independent origin. *Id.* at 296, 807 S.E.2d at 653 (Dillon, J., dissenting). Next, the dissenting judge stated that any error in admitting the in-court identification of Ms. Lopez was harmless beyond a reasonable doubt in light of the other evidence against defendant. *Id.* at 296–97, 807 S.E.2d at 653–54. Accordingly, the dissenting judge concluded that there was "no reversible error." *Id.* at 296, 807 S.E.2d at 653.

On 11 December 2017, the State filed a notice of appeal as of right based on the dissenting opinion in the Court of Appeals pursuant to N.C.G.S. § 7A-30(2). Additionally, the State filed a petition for discretionary review of additional issues, which the Court allowed. In its petition, the State asks this Court to correct what it

contends is the majority's flawed interpretation of the EIRA in dicta, namely that "all eyewitness identification procedures should comply with the requirements of the EIRA" even though here the disputed procedures were conducted by a legal assistant and by its terms, the EIRA applies to law enforcement officers.

<u>Standard of Review</u>

Our review of the denial of a motion to suppress is limited to determining "whether competent evidence supports the trial court's findings of fact and whether the findings of fact support the conclusions of law." *State v. Biber*, 365 N.C. 162, 167–68, 712 S.E.2d 874, 878 (2011) (citing *State v. Brooks*, 337 N.C. 132, 140–41, 446 S.E.2d 579, 585 (1994)). "The trial court's findings of fact 'are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting.' " *State v. Saldierna*, 371 N.C. 407, 421, 817 S.E.2d 174, 183 (2018) (quoting *State v. Eason*, 336 N.C. 730, 745, 445 S.E.2d 917, 926 (1994), *cert. denied*, 513 U.S. 1096 (1995)), *cert. denied*, 139 S. Ct. 1279 (2019). A trial court has the benefit of being able to assess the credibility of witnesses, weigh and resolve any conflicts in the evidence, and find the facts, all of which are owed great deference by this Court. *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619–20 (1982).

However, the trial court's conclusions of law are fully reviewable on appeal. *State v. McCollum*, 334 N.C. 208, 237, 433 S.E.2d 144, 160 (1993) (citing *State v. Mahaley*, 332 N.C. 583, 592–93, 423 S.E.2d 58, 64 (1992)), *cert. denied*, 512 U.S. 1254 (1994). Similarly, this Court reviews the decision of the Court of Appeals for any

error of law. *Brooks*, 337 N.C. at 149, 446 S.E.2d at 590 (citations omitted).

Furthermore, we agree with the Court of Appeals that the extent to which a witness's

in-court identification has an independent origin is a question of law or legal inference

rather than a question of fact. *See State v. Pulley,* 180 N.C. App. 54, 65, 636 S.E.2d

231, 240 (2006).

<u>Analysis</u>

## I.     Due Process Claim

The governing law applicable to the issues before us in this case is well-

established.   As a general proposition, "the jury, not the judge, traditionally

determines the reliability of evidence." *Perry v. New Hampshire*, 565 U.S. 288, 245,

132 S. Ct. 716, 728, 181 L. Ed. 2d 694, 711 (2012).   However, due process

considerations do place limitations upon the admission of eyewitness identification

evidence obtained as the result of impermissible official conduct. *Id.* at 248, 132 S.

Ct. at 730, 181 L. Ed. 2d at 713.  The initial inquiry in which a reviewing court is

required to engage in conducting such a due process inquiry is "whether the

identification procedure was so suggestive as to create a substantial likelihood of

irreparable misidentification." *State v. Fowler*, 353 N.C. 599, 617, 548 S.E.2d 684,

697–98 (2001) (citing *U.S. v. Marson*, 408 F.2d 644, 650 (4th Cir. 1968); *State v.

Simpson*, 327 N.C. 178, 186, 393 S.E.2d 771, 776 (1990); *State v. Hannah*, 312 N.C.

286, 290, 322 S.E.2d 148, 151 (1984)).   In order to make the relevant determination,

the Court must utilize a two-step process, with the first step requiring the Court to

"determine whether the identification procedures were impermissibly suggestive," *Fowler*, 353 N.C. at 617, 548 S.E.2d at 698 (citing *State v. Powell*, 321 N.C. 364, 368–69, 364 S.E.2d 332, 335 (1988); *Hannah*, 312 N.C. at 290, 322 S.E.2d at 151; *State v. Headen*, 295 N.C. 437, 439, 245 S.E.2d 706, 708 (1978)), and with the second step, which becomes relevant in the event that "the procedures were impermissibly suggestive," requiring the Court to determine "whether the procedures create a substantial likelihood of irreparable misidentification." *Fowler*, 353 N.C. at 617, 548 S.E.2d at 698 (citing *Powell*, 321 N.C. at 369, 364 S.E.2d at 335; *Hannah*, 312 N.C. at 290, 322 S.E.2d at 151; *Headen*, 295 N.C. at 493, 245 S.E.2d at 708). Even if the witness was subjected to impermissibly suggestive identification procedures, that witness's in-court identification testimony may still be admissible in the event that the trial court finds "that the in-court identification has an origin independent of the invalid pretrial procedure" because, in that case, the procedures have not created a substantial likelihood of irreparable misidentification. *State v. Bundridge*, 294 N.C. 45, 56, 239 S.E.2d 811, 819 (1978) (citing *U.S. v. Wade*, 388 U.S. 218, 242, 87 S. Ct. 1926, 1940, 18 L. Ed. 2d 1149, 1166 (1967); *State v. Henderson*, 285 N.C. 1, 12, 203 S.E.2d 10, 18 (1974)); *see also Powell*, 321 N.C. at 369, 364 S.E.2d at 336 (upholding a trial court determination that "the in-court identification of the defendant was of independent origin and untainted by illegal pretrial procedures"); *State v. Harris*, 308 N.C. 159, 166, 201 S.E.2d 91, 96 (1983) (holding that, "[e]ven assuming arguendo that the pretrial photographic lineup procedure could be found impermissibly suggestive,

we find more than adequate evidence to support the trial court's decision to hold [the witness's] in-court identification admissible as being of independent origin"); *State v. Thompson*, 303 N.C. 169, 172, 277 S.E.2d 431, 434 (1981) (finding "adequate evidence in the record to support the trial court's decision holding the in-court identification admissible as being of independent origin").

In determining whether the witness's in-court identification had the necessary independent origin, a court should consider "the opportunity of the witness to view the accused at the time of the crime, the witness' degree of attention at the time, the accuracy of his prior description of the accused, the witness' level of certainty in identifying the accused at the time of the confrontation, and the time between the crime and the confrontation." *Thompson*, 303 N.C. at 172, 277 S.E.2d at 434 (citing *Neil v. Biggers*, 409 U.S. 188, 200, 93 S. Ct. 375, 382, 34 L. Ed. 2d 401, 411 (1971); *Headen*, 295 N.C. at 437, 245 S.E.2d at 706). It is not necessary for the Court to find that all five of the relevant factors militate in favor of a finding of independent origin in order to admit a witness's in-court identification into evidence despite the fact that impermissibly suggestive identification procedures had taken place during the investigative process. *Powell*, 321 N.C. at 370, 364 S.E.2d at 336. However, "[a]gainst these factors must be weighed the corrupting effect of the suggestive procedure itself." *State v. Pigott*, 320 N.C. 96, 100, 357 S.E.2d 631, 634 (1987) (citing *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S. Ct. 2243, 2253, 53 L. Ed. 2d 140, 154 (1977)).

We first consider whether the procedures were impermissibly suggestive. The partial concurrence suggests that we should not address this issue. However, it is the first part of a two-part test. We have stated that "[t]his due process analysis requires a two-part inquiry. *First, the Court must determine* whether the identification procedures were impermissibly suggestive." *Fowler*, 353 N.C. at 617, 548 S.E.2d at 698 (emphasis added); *accord State v. Rogers*, 355 N.C. 420, 432, 562 S.E.2d 859, 868 (2002). We are not required to skip part of the analysis. *See State v. Knight*, 282 N.C. 220, 226–27, 192 S.E.2d 283, 287–88 (1972) (concluding first that identification procedure was impermissibly suggestive and then determining it was of independent origin); *but see Powell*, 231 N.C. at 369, 364 S.E.2d at 336 (assuming *arguendo* that procedures were impermissibly suggestive and continuing to the second part of the inquiry). Thus, while the partial concurrence "do[es] not believe that there is any need for the Court to address the issue of whether Ms. Alvarez was subjected to impermissibly subjective identification procedures," our precedents suggest that we should. The independent origin inquiry, on which both our and the partial concurrence's conclusions are based, is merely the second part of the due process inquiry.[2]

---

[2] The partial concurrence is, of course, correct that we generally "avoid constitutional questions, even if properly presented, where a case may be resolved on other grounds." *Anderson v. Assimos*, 356 N.C. 415, 416 572 S.E.2d 101, 102 (2002). However, the constitutional question here is whether due process requires the suppression of eyewitness identification evidence. Our precedents identify this as a two-part inquiry, and by addressing, rather than assuming, the first and logically necessary part of the test, we provide useful guidance on what constitutes an unnecessarily suggestive identification

On the first question, the Court of Appeals correctly examined the trial court's findings of fact and found that they did not support the conclusion of law that the procedures used were not impermissibly suggestive. In particular, Ms. Smith's actions in showing Lopez and Alvarez the video of Mr. Malone's interview and recent photographs of Malone and Spence are exactly the kind of highly suggestive procedures that have been widely condemned as inherently suggestive. *See Stovall v. Denno*, 388 U.S. 293, 302, 87 S. Ct. 1967, 1972–73, 18 L. Ed. 2d 1199, 1206 (1967); *State v. Oliver*, 302 N.C. 28, 45, 274 S.E.2d 183, 194 (1981). The U.S. Supreme Court has held that single-suspect identification procedures "clearly convey[ ] the suggestion to the witness that the one presented is believed guilty by the police." *Wade*, 388 U.S. at 234, 87 S. Ct. at 1936, 18 L. Ed. 2d at 1161. Here, Ms. Smith did more than simply convey a suggestion. "[I]n the furtherance of her trial preparation duties," she effectively told Lopez and Alvarez that they were viewing pictures of the men police believed were responsible for the shooting by "show[ing] them photos she had obtained of the defendant and Marquis Spence" in a meeting two weeks before trial.

The State contends that this was not an "identification procedure" because Ms. Smith was only engaging in witness preparation in anticipation of their upcoming

procedure. Moreover, given that the trial court held that the procedures were not impermissibly suggestive, we should explain why we disagree rather than simply "assume" the opposite.

trial testimony and that Ms. Smith only showed them the video of Mr. Malone's interview because Ms. Alvarez asked to see it. Neither Ms. Lopez nor Ms. Alvarez identified Mr. Malone when shown a photo lineup two days after the shooting. Further, Ms. Alvarez identified someone other than Mr. Malone as the shooter and picked an entirely different "filler" person as the second person involved. After that, as found by the trial court, "[n]o law enforcement officer showed either Claudia or Cindy anymore photos other than the ones shown during the course of the arrays. . . . [E]ach went several years without contact from the District Attorney's office or contacting the District Attorney's office or without any further interaction with law enforcement in connection with all these events." Under these circumstances, for Lopez and Alvarez to be shown pictures and a videotaped interview, even for just a few minutes, of the person now on trial for murder goes far beyond the line where trial preparation ends and witness coaching begins. The facts as found by the trial court in this case lead inescapably to the legal conclusion that the procedures employed by the District Attorney's office on 29 February 2016 were impermissibly suggestive.

To be clear, our conclusion that impermissibly suggestive procedures were used in this case is based on the photographs and video of Mr. Malone that Ms. Lopez and Ms. Alvarez viewed a few days before trial.

Although an impermissibly suggestive identification procedure was used during the 29 February 2016 meeting between Ms. Smith, Ms. Lopez, and Ms.

Alvarez, the second question is whether the procedure gave rise to a substantial likelihood of irreparable misidentification. On this second question we disagree with the majority below because the trial court's findings of fact support the legal conclusion that Ms. Alvarez's in-court identification of defendant was of independent origin and sufficiently reliable.

We examine the five factors set out in *State v. Pigott*, 320 N.C. at 99–100, 357 S.E.2d at 634, as to each witness, namely the opportunity of the witness to view the defendant at the time of the crime, the witness's degree of attention, the accuracy of any prior description of the defendant, the level of certainty demonstrated by the witness at the time of the confrontation, and the time between the crime and the confrontation. The trial court's findings with respect to independent origin begin with the witnesses' opportunity to view the crime. Here there are some differences between the two eyewitnesses. While both had the same "short period of time from 75 to 90 seconds" within which to view the two males and the shooting, Ms. Alvarez was much closer, just four feet, from Mr. Jones when he was shot while Ms. Lopez was within ten feet of the shooter on the porch. This factor supports a finding of independent origin for Ms. Alvarez, and does so more strongly than for Ms. Lopez.[3]

---

[3] The relative strength of the reliability of the two eyewitnesses' identifications of defendant is significant because it explains why we hold that Ms. Alvarez's testimony was properly admitted and that any error in admitting Ms. Lopez's testimony was harmless.

Similarly, as to degree of attention, the trial court found that Ms. Alvarez and Ms. Lopez "indicated that they were paying attention." The trial court's finding was supported by the evidence, at least as to Ms. Alvarez. Ms. Alvarez stated that she was "paying attention to him the minute he got out of the car." Asked why, she said it was because "he had his hands in his pocket the whole time. One of his hands in his pocket the whole time. He wasn't really speaking. He wasn't saying nothing. And for some reason, like, I was just focused on him the whole time." In contrast, Ms. Lopez, when asked what she remembered of the person who actually fired the gun, responded that "[h]im specifically, his face, um, I was in shock, like I said, that day so the only thing I remember him about is his hair, that it was about this long." Later she testified "I never really paid much attention to his face because the whole time he was standing in front of us he just had his hand in his pocket." This factor again supports a finding of independent origin as to the in-court identification by Ms. Alvarez and does so more strongly than for Ms. Lopez.

Regarding the accuracy of the prior description, the trial court made the following findings of fact as to Ms. Lopez: (1) Ms. Lopez described the shooter as having shoulder-length hair, (2) Ms. Lopez identified Marquis Spence as one of the two suspects, particularly as the person who did not shoot Mr. Jones, and (3) although she lingered over defendant's photo during the photo lineup, she did not identify defendant or anyone else in the lineup as the second suspect who had shot Jones. The trial court made the following findings as to Ms. Alvarez: (1) Ms. Alvarez identified

Marquis Spence as one of the two suspects, particularly as the person who *did* shoot Mr. Jones, (2) Ms. Alvarez did not identify defendant as the second suspect when presented with a photo lineup, and (3) Ms. Alvarez identified a "completely unassociated individual" as the second suspect when presented with a photo lineup. While Ms. Lopez accurately described defendant's shoulder-length hair, this appears to be the only accurate detail identified by the trial court. Significantly, Ms. Alvarez had a credible explanation of why she was unable to identify defendant from the photo lineup conducted by police two days after the incident, but immediately identified him upon seeing a picture on Facebook, namely because of the difference in his hair. She testified that had the officers shown her the picture she saw on Facebook, she would have been able to identify defendant as the shooter because in the Facebook picture he had his hair down similar to how it looked on the day of the murder. Accordingly, this factor somewhat undermines a finding of independent origin as to both witnesses, but with less force as to Ms. Alvarez.

Regarding the level of certainty, the trial court found and the evidence reflects that, at the time of the meeting with Iris Smith, Ms. Alvarez "recognized the photos as the two males as they looked at or around the time of the shooting." In particular and, in our view, most importantly as to this factor, the trial court found that both Lopez and Alvarez had seen the photos before and that Ms. Alvarez, upon seeing the photos on her own, independently recognized defendant as one of the two people involved in the shooting soon after the shooting had taken place. Ms. Alvarez testified

that, upon seeing a photo of defendant on Facebook a week or two after the incident, which she had not been shown in the lineup, and which showed his hair in the way he was wearing it at the time of the shooting, she was sure that he was the person who shot Mr. Jones.

Ms. Lopez, however, did not recognize defendant as the shooter based either on the photos or on viewing the defendant as he exited the police car on 29 February 2016.[4]  Therefore, while Alvarez identified defendant with a high degree of certainty, apparently based on her exposure to photographs between the time she spoke with police and the time she spoke to the District Attorney's office, Lopez did not identify defendant with any degree of certainty at the time of the confrontation.  This factor supports a finding of independent origin as to the in-court identification by Alvarez, but undermines such a finding for the identification by Lopez.

Finally, as to the length of time between the crime and the confrontation, the trial court accurately found that approximately three and a half years passed between the shooting and the impermissibly suggestive events of 29 February 2016.  However, only a week or two passed between the crime and Ms. Alvarez's identification of defendant from the Facebook picture.  This factor undermines a finding of

---

[4] While the trial court found that Ms. Lopez recognized Mr. Malone as he exited the police car, the Court of Appeals majority accurately noted that this finding was not supported by evidence.

independent origin as to Ms. Lopez but not as to Ms. Alvarez, since Ms. Alvarez identified defendant shortly after the crime.

Ultimately, weighing factors such as these is not an exercise employed with mathematical precision. Certain factors may be more important than others depending upon the nature of the impermissibly suggestive procedure as well as the particular facts of the case. "Whether there is a substantial likelihood of misidentification depends upon the totality of the circumstances." *State v. Pigott*, 320 N.C. at 99, 357 S.E.2d at 634 (citing *State v. Flowers,* 318 N.C. 208, 220, 347 S.E.2d 773, 781 (1986)). In this case, we conclude that in the totality of the circumstances, Ms. Alvarez's opportunity to view the crime, the degree of attention she paid to the suspects, the short period of time between the crime and her identifying defendant from an accurate picture, and the certainty of her identification outweigh her inaccurate initial description. Weighing against this the possible impact of the impermissibly suggestive procedures, the evidence demonstrates that for Ms. Alvarez, her identification was made long before seeing the video of defendant's interview with police or the pictures that Ms. Smith showed her, such that those procedures had no impact on her identification and did not create the risk of a misidentification.

According to the trial court's findings of fact, supported by the evidence adduced at the pretrial hearing, Ms. Alvarez's identification of defendant was based primarily upon the impression she formed after seeing a photograph of the defendant

on a Facebook page, independent from any police- or prosecutor-led identification proceeding. She saw the photograph one or two weeks after the shooting and, at that time, was confident that defendant was the shooter. This fact, in conjunction with the factors discussed above, convinces us that the trial court correctly concluded that Ms. Alvarez's in-court identification had an origin that was independent of the impermissibly suggestive identification procedure conducted by the State. Assuming that the identification testimony of Ms. Lopez was improper because it lacked an independent origin, any failure to suppress it was not prejudicial because Ms. Alvarez's in-court identification was properly admitted. With one witness confidently identifying defendant as the shooter, we believe beyond any reasonable doubt that suppressing a second identification would not change the outcome here. *See* N.C.G.S. § 15A-1443(c) (providing that a violation of a defendant's federal constitutional rights is prejudicial unless harmless beyond a reasonable doubt).

## II. EIRA Claim

In addition to the constitutional claim, there is also before us a statutory claim that the events of the 29 February 2016 meeting between eyewitnesses Lopez and Alvarez and Iris Smith violated the EIRA, which defendant asserts in the alternative if we were to reverse the Court of Appeals on the due process claim and the State brings to us by way of a petition for discretionary review. The State contends that the EIRA explicitly only addresses the actions of law enforcement officers and therefore

is inapplicable to this case because the allegedly impermissibly suggestive identification procedures here were carried out by an employee of the District Attorney's office. Because the Court of Appeals stated in dicta that the EIRA applies to all eyewitness identification procedures, the State argues this Court should clarify the law. Defendant urges us to take a more comprehensive view of the purpose of EIRA, and, to remand for consideration of defendant's EIRA claim if we do not affirm the majority on his constitutional claim. It is a question of first impression for this Court, but one that we do not need to address at this time because of our disposition of defendant's constitutional claim. Our holding here is that, while the identification procedures used by Ms. Smith in the days before trial were impermissibly suggestive, the relevant in-court identification was of independent origin and sufficiently reliable; thus, there is nothing further to be added by concluding that the EIRA does or does not apply.

Conclusion

Thus, for the reasons set forth above, we hold that the Court of Appeals properly found that Ms. Alvarez and Ms. Lopez were subjected to witness identification procedures that were impermissibly suggestive, but erred in failing to recognize that the evidence demonstrates that Ms. Alvarez's identification was sufficiently of independent origin to negate a substantial likelihood of a misidentification.

AFFIRMED IN PART AND REVERSED IN PART.

Justice ERVIN, concurring in the result, in part, and dissenting, in part.

Although I concur in the Court's determinations that the trial court did not err by finding that Ms. Alvarez's identification of defendant as the perpetrator of the killing of Mr. Jones and the shooting of Mr. White had an origin independent of any impermissibly suggestive identification procedures to which she might have been subjected and that any error that the trial court might have committed in admitting the identification testimony of Ms. Lopez was harmless beyond a reasonable doubt given the admission of Ms. Alvarez's identification testimony, coupled with the existence of other evidence tending to show defendant's involvement in the commission of the crimes that he was convicted of committing, I am unable to agree with the Court's decision to address the "impermissible suggestibility" issue and with aspects of the manner in which the Court has made its "impermissible suggestibility" and "independent origin" determinations.  As a result, I concur in the result reached in the Court's opinion, in part, and dissent from the Court's opinion, in part.

In its opinion, the Court affirms the Court of Appeals' decision to overturn that portion of the trial court's order denying defendant's motion to suppress the identification testimony of Ms. Alvarez and Ms. Lopez based upon a determination that the identification procedures that led to the challenged identification testimony were "impermissibly suggestive."  *State v. Fowler*, 353 N.C. 599, 617, 538 S.E.2d 684, 698 (2001) (citing *State v. Powell*, 321 N.C. 364, 368-69, 364 S.E.2d 332, 335 (1988); *State v. Hannah*, 312 N.C. 286, 290, 322 S.E.2d 148, 151 (1984); *State v. Headen*, 295

N.C. 437, 439, 245 S.E.2d 706, 708 (1978)). I am unable to join this portion of the Court's opinion for at least two reasons.

As an initial matter, while I share the Court's discomfort with certain of the events that occurred during the meeting that was held between Ms. Smith, Ms. Alvarez, and Ms. Lopez in the Alamance County Historic Courthouse, I do not believe that there is any need for the Court to address the issue of whether Ms. Alvarez was subjected to impermissibly subjective identification procedures during that meeting. In light of the Court's determination, in which I concur, that Ms. Alvarez's testimony identifying defendant as the person who killed Mr. Jones and wounded Mr. White had an origin that was independent of any impermissibly suggestive identification procedures to which she might have been subjected, any decision that we might make with respect to the issue of "whether the identification procedure was so suggestive as to create a substantial likelihood of irreparable misidentification," *id.*, would be of little more than academic interest. According to well-established North Carolina law, a reviewing court should "avoid constitutional questions, even if properly presented, where a case may be resolved on other grounds." *Anderson v. Assimos*, 356 N.C. 415, 416, 572 S.E.2d 101, 102 (2002). *See also Union Carbide Corp. v. Davis*, 253 N.C. 324, 327, 116 S.E.2d 792, 794 (1960) (stating that "[c]ourts must pass on constitutional questions when, but only when, they are squarely presented and necessary to the disposition of a matter then pending and at issue"). A witness's in-

court identification testimony is admissible in the event of a finding "that the in-court identification has an origin independent of the invalid pretrial procedure" regardless of the extent, if any, to which the witness in question was subject to an impermissibly suggestive identification procedure. *State v. Bundridge*, 294 N.C. 45, 46, 239 S.E.2d 811, 819 (1978) (citing *U.S. v. Wade*, 388 U.S. 218, 242, 87 S. Ct. 1926, 1940, 18 L. Ed 2d 1149, 1166 (1967); *State v. Henderson*, 285 N.C. 1, 12, 203 S.E.2d 10, 18 (1974)); *see also State v. Harris*, 308 N.C. 159, 166, 201 S.E.2d 91, 96 (1983) (holding that, "[e]ven assuming arguendo that the pretrial photographic lineup procedure could be found impermissibly suggestive, we find more than adequate evidence to support the trial court's decision to hold [the witness's] in-court identification admissible as being of independent origin"). Thus, given that we have decided that the trial court did not err by finding Ms. Alvarez's identification of defendant as a perpetrator of the crimes charged to be of "independent origin," I see no need to address the merits of defendant's contention that Ms. Alvarez had been subjected to impermissibly suggestive identification procedures and dissent from the Court's decision to do so.

Secondly, I have concerns about certain statements that the Court has made in addressing the "impermissible suggestibility" issue. According to the applicable standard of review, an appellate court reviewing a trial court order granting or denying a suppression motion "is strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which

case they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law." *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982) (citing *State v. Thompson*, 303 N.C. 169, 277 S.E.2d 413 (1981); *State v. Gray*, 268 N.C. 69, 150 S.E.2d 1 (1966); 4 Strong's N.C. Index 3d § 175 (1976). In light of the applicable standard of review, I am concerned about the Court's statement that Ms. Smith "effectively told [Ms.] Lopez and [Ms.] Alvarez that they were viewing pictures of the men [that] police believed were responsible for the shooting." After carefully reviewing the trial court's findings, I am unable to find any support of this assertion. Similarly, without otherwise commenting upon the manner in which Ms. Smith conducted her meeting with Ms. Alvarez and Ms. Lopez, I am not certain that the trial court's findings fully support the Court's comment that, "for [Ms.] Lopez and [Ms.] Alvarez to be shown pictures and a videotaped interview, even for just a few minutes, of the person now on trial for murder goes far beyond the line where trial preparation ends and witness coaching begins." As a result, aside from my belief that the Court would be better advised to refrain from discussing the "impermissible suggestibility" issue at all, I am not persuaded that the analysis upon which my colleagues rely is fully consistent with the applicable standard of review.

Finally, while I agree with my colleagues that the trial court's findings support its conclusion that the identification testimony of Ms. Alvarez had an origin independent of any impermissibly suggestive identification procedures to which she

might have been subjected, I am concerned about the extent to which the Court's discussion of the "independent origin" issue relies upon an analysis of the testimony received at the suppression hearing rather than upon the findings of fact that the trial court made at the conclusion of that proceeding.[1]  In addition, in light of the Court's decision to uphold the trial court's determination that the identification by Ms. Alvarez of defendant as the perpetrator of the crimes was of "independent origin" and the Court's related decision that the admission of Ms. Alvarez's identification testimony suffices to render any error that the trial court may have committed in admitting Ms. Lopez's identification testimony harmless beyond a reasonable doubt, I see no need to address the relative strength of the State's independent origin showing as between Ms. Alvarez and Ms. Lopez and do not believe that the relative strength of the identification testimony provided by the two witnesses sheds any light upon the non-prejudice analysis that we are called upon to conduct in this case.

All of that being said, however, I am fully satisfied that the trial court's findings of fact, which reflect a careful consideration of each of the factors that are relevant to the making of an "independent origin" determination, *Thompson*, 303 N.C. at 172, 277 S.E.2d at 434 (citing *Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401, 411 (1971); *Headen*, 295 N.C. 437, 245 S.E.2d 706), support the trial

---

[1] For example, the Court's discussion of the degree to which Ms. Alvarez and Ms. Lopez were paying attention at the time that they observed the killing of Mr. Jones and the shooting of Mr. White rests, to a considerable extent, upon an analysis of testimony admitted at the suppression hearing rather than the trial court's factual findings.

court's determination that Ms. Alvarez's identification of defendant as the perpetrator of the crimes charged was of independent origin. Among other things, the trial court found that Ms. Alvarez was within four feet of the perpetrators at the time that the offense was committed; that the offenses were committed over a period of 75 to 90 seconds; that the shooting of Mr. Jackson and Mr. White was a "startling event" "that would claim your attention or cause you to pay no attention and flee from the situation"; that Ms. Alvarez was "paying close attention to the two males that came up and to Mr. Jones"; that Ms. Alvarez "gave a general description of clothing, hair and body piercing and the car"; that Ms. Alvarez recognized defendant as one of the perpetrators of the crimes charged when she saw an on-line photo of defendant; and that Ms. Alvarez appeared confident in the accuracy of her identification testimony. Thus, I concur in the Court's ultimate determination that the trial court did not err by concluding that the testimony of Ms. Alvarez identifying defendant as one of the perpetrators of the killing of Mr. Jones and the shooting of Mr. White had an origin independent of any impermissibly suggestive identification procedures to which she had been subjected and that the admission of Ms. Alvarez's identification testimony, coupled with the other evidence tending to show defendant's involvement of the commission of the crimes charged, rendered any error that the trial court might have committed in admitting Ms. Lopez's identification testimony harmless beyond a

*Ervin, J., concurring in the result in part and
dissenting in part*

reasonable doubt.  As a result, for all of these reasons, I concur in the result reached

in the Court's opinion in part, and dissent from the Court's opinion, in part.

Justices NEWBY and HUDSON join in this separate opinion.